## 35074. FAMILY FUND LIFE INSURANCE COMPANY
### *v.* ROGERS.

Decided June 23, 1954.

*Wm. F. Buchanan, John F. Gregory,* for plaintiff in error.
*John D. Edge,* contra.

QUILLIAN, J. The evidence showed that the application was filled in by the company's agent, a Mr. Deason, while he and Newton were riding in an automobile in quest of prospects to whom the agent proposed to sell insurance policies. The agent was never placed on the stand, but Newton testified that he gave information to the agent as to his father's height, weight, and age, but said he did not write anything in the application; that the agent had charge of it. He was never interrogated as to whether he supplied any of the answers to the various questions in reference to his father's health and physical history. He testified that he did not sign the application and did not know whether or not his father signed it; that he paid the premium and in a few days thereafter the agent delivered the policy to him. The application was introduced in evidence and contained various representations that the insured, Willie N. Rogers, was in good health and had had no medical treatment, and had not suffered from heart trouble. The name Willie N. Rogers appeared on it in the place thereon designated for the applicant to sign. A witness appeared thereon. A doctor testified that he examined Mr. Rogers in 1942, that on March 20, 1948, an electrocardiogram revealed that he was suffering of myocarditis or

heart trouble, and that in some instances symptoms of that disease disappear with time, but that usually they did not. He stated that the symptoms usually grew worse with time. A doctor of chiropractics testified that Mr. Rogers came to him for treatment in 1948 and again in October, 1950, suffering with heart trouble and died with that disease on October 19, 1950. This doctor testified that Rogers could not lie down to sleep in 1950. A witness who went to court with Rogers in another county testified that for several hours Rogers got about all right, but that on the way home he lay down in the automobile. Newton F. Rogers, the beneficiary in the policy and plaintiff in the case, testified in reference to his father's health that he did not know it was bad in September, 1950, that he got around all right, looked after his business and did some surveying. An application not attached to the policy, containing a statement that the insured was in good health, was introduced in evidence.

While there was considerable evidence tending to show that the insured was not in sound health when the policy was delivered, we cannot hold that it conclusively showed that the insured was not in good health at the time the policy was delivered. A physician examined him in 1943, seven years before his death, by medium of electrocardiogram, and testified that he was suffering from heart trouble prior to his death in 1950. And he died of what a chiropractor, who was then treating him, described as the same kind of heart trouble that the doctor's examination in 1943 revealed. Yet the doctor testified: "As to whether or not I have ever seen a case of myocarditis clear up completely; well, I have seen them get symptoms free under usual exertion and getting about, but the most of them if they exert themselves and they have had myocarditis in any degree, unless it is toxic, they usually don't get where they can get about and do everything."

The plaintiff testified: "I saw my father most every day, I was generally down there around once a day, back and forth; what time I wasn't down there he was in town every day or two. Yes, he was able to carry on his work; he looked after the farm down there where he was living and was also looking after one below Adairsville. Yes, he was doing some surveying along about that time, walking around over these hills in North Geor-

gia. . . I did not know of a Mr. Greeson that carried my father over to Rome to Dr. Knight for treatment during 1948 and 1950. I didn't know that Mr. Greeson carried my father over to Rome back in 1948, October of 1948, for fifathol (sic) three times each week. As to whether or not I do know that he was carrying him over there in 1950, well, I think he went over about two weeks before he passed away in 1950. As to whether or not he wasn't going three times a week for two weeks, well, I said he went about two weeks prior to his death; I don't know how many times he was going then. No, I didn't know that my father was suffering from heart disease. I did not know that my father had shortness of breath and had to sit up at night in order to sleep. I didn't know anything about what the condition of my father's health was medically. I knew that he did get around and could get around; he seemed to get around pretty well. What his heart condition was I did not know."

Sound health does not mean perfect health, but under our law, like " 'Good health' is a relative term, and does not mean absolute freedom from physical infirmity, but only such a condition of body and mind as that one may discharge the ordinary duties of life without serious strain upon the vital powers." *Atlantic & Birmingham R. Co.* v. *Douglas,* 119 *Ga.* 658 (2) (46 S. E. 867); *National L. & Acc. Ins. Co.* v. *Bonner,* 58 *Ga. App.* 876 (1) (200 S. E. 319).

While the medical evidence was indicative of the probability that the insured was suffering from heart trouble at the time the policy was delivered in September, 1950, just before his death in October of that year, the evidence did not indicate that his state of health was any worse in September than it was the month when the insurance was applied for. Under a long line of decisions of this court, "The requirement in a policy of insurance, that the insured be in sound health at the date of the issuance of the policy, refers to a change in health between the time of taking the application for insurance and the date of the issuance of the policy, where the policy is issued without medical examination and without the application for insurance being attached to and made a part of the policy of insurance." *Fowler* v. *Liberty Nat. Life Ins. Co.,* 73 *Ga. App.* 765, 768 (1) (38 S. E. 2d 60). See also, to the same effect, *Interstate Life &c. Co.* v. *McMahon.* 50 *Ga. App.* 543 (2) (179 S. E. 132).

The application became no part of the insurance policy, not being attached thereto. Code § 56-904. Consequently, merely by accepting the policy the insured did not become bound by the stipulation contained in the application, "that any misrepresentations or concealment of fact shall render any policy issued null and void and that no obligation shall exist against the company under such policy until the policy is actually issued and delivered to me while the person to be insured is alive and in sound health."

The defendant's answer set up that the application made by the insured or the plaintiff on behalf of the insured contained false representations as to the applicant's health; that these representations were material and were relied on by the defendant in deciding whether to issue the policy; and that for this reason the policy was void.

As stated in the company's brief, the application was really made by the plaintiff, Newton F. Rogers. His undisputed testimony was that the application was prepared by the company's agent while he and the agent were riding in an automobile; that he gave the agent truthful answers as to the insured's age, height, and weight; and that he did not sign the application and did not know whether the insured signed it. There was no evidence that he gave the agent any other information concerning the insured, or that he answered any other questions of the agent or knew the contents of the application. There was no evidence that the insured participated in any way in making the application, was even informed of its contents, or signed it. It is true that the application was introduced in evidence and his name appeared in it, at the place therein designated for the applicant's signature, which, under the holding in *Hayes* v. *Pittman,* 66 *Ga.* 257, was not sufficient evidence that he signed it. There was no evidence in the record as to any other representations being made by the insured or the plaintiff to the insurance company or its agent. The evidence did not show that any false or fraudulent representation was made to the company by either the plaintiff or the insured. *Barber* v. *All American Assurance Co.,* 89 *Ga. App.* 270 (79 S. E. 2d 48).

There is no merit in the contention that the judge in his charge failed to define the term good health. The court is not

ordinarily required to define words and phrases used in a statute under which a trial is had unless requested in writing to do so, or unless the phrasing is so technical that laymen would not be expected, in the absence of appropriate explanation by the court, to understand the meaning. *Holmes* v. *Clisby*, 121 *Ga.* 241 (7) (48 S. E. 934, 104 Am. St. R. 103); *Cordele Sash &c. Co.* v. *Wilson Lumber Co.*, 129 *Ga.* 290 (3) (58 S. E. 860). Much less is it the duty of the court, in the absence of a request, to interpret words and terms employed by parties in their private contracts. If a party desires the court to instruct the jury as to the meaning placed upon the language of a contract, either by authoritative lexicographers or by the courts, he should request that the definition or definitions he desires be given in charge to the jury.

There being no evidence to support the company's defense that the issuance of the policy was induced by false and fraudulent statements, though all of the court's charge, including a portion of it complained of by the company, was not adjusted to the factual structure of the case, it certainly was not hurtful to the company, since it was not entitled to any charge to the jury on that subject.

*Judgment affirmed. Felton, C. J., and Nichols, J., concur.*